# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD GUEVARA, | ) 1:10cv02149 AWI DLB |
| | ) |
| | ) |
| | ) FINDINGS AND RECOMMENDATIONS |
| Plaintiff, | ) REGARDING PLAINTIFF'S |
| | ) SOCIAL SECURITY COMPLAINT |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

## BACKGROUND

Plaintiff EDWARD GUEVARA ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income pursuant to Title XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Magistrate Judge for Findings and Recommendations to the District Court.

## FACTS AND PRIOR PROCEEDINGS[1]

Plaintiff filed his application on June 19, 2008, alleging disability since May 14, 2008, due to a brain tumor, diabetes, headaches, memory problems, right leg pain, left lower jaw problems and high blood pressure. AR 129-131, 137-143. After his application was denied

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1

initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 59, 69, 102-103.  ALJ James P. Berry held a hearing on March 9, 2010, and issued a decision denying benefits on April 23, 2010.  AR 8-18, 20-58.  The Appeals Council denied review on September 17, 2010.  AR 1-5.

Hearing Testimony

ALJ Berry held a hearing on March 9, 2010, in Fresno, California.  Plaintiff appeared with his attorney, Jeffrey Milam.  Vocational expert ("VE") Judith Najarian also appeared and testified.  AR 20.

Plaintiff testified that he was 56 years old at the time of the hearing.  He completed the tenth grade and did not receive a GED.  Plaintiff was in special classes while he was in school, but then dropped out because he was foolish.  He did not attempt to get a GED because he didn't think about it at the time.  AR 23-24.  Plaintiff had trouble with reading, writing and math.  Now, he can read words in the newspaper but cannot put words together to make sentences.  AR 25.

Plaintiff had surgery for a brain tumor and his mental functioning worsened after the surgery.  AR 26.  Plaintiff has trouble with his memory and has always been a slow learner.  AR 29.  Plaintiff has talked to his doctor about the additional memory problems and was told that it was normal for the type of surgery he had.  AR 33.  Plaintiff also gets very dizzy and wakes up confused in the middle of the night.  AR 34.  He gets headaches three or four times a week, for about 15 minutes each time, and takes Ibuprofen.  AR 35.  When he gets a headache, he cannot concentrate and has to lie down.  AR 36.

Plaintiff was not married and lived with his parents because they take care of him.  His parents watch for seizures and cook for him.  Plaintiff can cook simple things, although his parents tell him not to cook because he has burned things.  AR 26-28.  He does not have a driver's license currently because his doctors reported his seizures to the DMV.  AR 29.

Plaintiff was 5 feet, 7 inches tall and weighed 195 pounds.  He receives $272 a month in General Relief.  AR 29.  He last worked two or three years ago sanding cars and doing body work.  AR 30.  Plaintiff did not think he could return to this job because he still has a seven

millimeter tumor in his head. AR 32. Doctors want to perform laser surgery and told him that there's a risk of stroke with the procedure. AR 32.

Plaintiff testified that his seizures are not controlled by medication and that he has had five or six since November, at a rate of one or more per month. AR 36. He passes out after a seizure and the longest was five minutes long. His parents have seen his seizures but he has not had one in front of a doctor. AR 37.

Plaintiff also has pain his knee, right toes and mid-back that radiates to his neck. X-rays have shown that he has arthritis in his neck. AR 37. Plaintiff thought that his surgery caused the problems with his right leg. AR 50. His right shoulder hurts all the time and he cannot reach in any direction with the right arm. AR 40.

Plaintiff has diabetes, also, and takes insulin and pills. AR 38. He tests himself five or six times a day and has to take down throughout the day, for about an hour a time, because of fatigue. AR 38-39. Plaintiff thought that the tiredness began after his surgery. AR 39. He testified that he takes all of his medications as directed. AR 48.

Since the operation, Plaintiff has been scared to be alone. AR 41. During the day, he might clean up his room, take a shower and walk to his cousin's house and spend a few hours there. AR 41. It takes him about 15 minutes to walk to his cousin's house and it makes him tired and bothers his back. AR 42. He also has a "lady friend" that he visits quite a bit. She cooks for him and does his laundry. AR 43. Plaintiff also watches television, but does not read or listen to music. AR 42. He does not do laundry because his mother won't let him. AR 43.

Plaintiff also testified that he is depressed, though he hasn't seen any mental health doctors because of transportation issues. AR 44. He doesn't know why he's depressed and he sometimes just sits in the room and thinks. AR 44. Plaintiff was going to church often before his surgery but now goes about every other Sunday. AR 45.

Plaintiff told the ALJ that he could lift and carry about 20 pounds and could be on his feet for about 20 minutes at a time, for about two hours total out of an eight hour day. AR 47-48. He could walk for 15 minutes and sit for about 20 minutes. AR 48. He thought that he laid down for about two hours out of an eight hour day. AR 49.

3

For the first hypothetical, the ALJ asked the VE to assume a person of Plaintiff's age, education and experience. This person can lift and carry 100 pounds occasionally, 50 pounds frequently, and stand, walk and sit for six hours each. This person must avoid exposure to dangerous moving machinery, unprotected heights and the operation of motorized vehicles. The VE testified that this person could not perform Plaintiff's past relevant work as a sander but could perform the medium positions of cleaner, counter supply worker and linen room attendant. AR 53-52.

For the second hypothetical, the ALJ asked the VE to assume a person who could lift 20 to 30 pounds and carry 20 pounds. This person could stand and sit for two hours total and walk for 15 minutes. This person would have difficulty remembering tasks and processes and difficulty concentrating. This person must occasionally lie down and rest for 15 minutes approximately two times per day. This person would have difficulty reaching in all directions with the dominant right upper extremity. The VE testified that this person could not perform Plaintiff's past relevant or any other work in the national economy. AR 54.

Medical Record

Plaintiff was admitted to Community Regional Medical Center on May 10, 2008, after being assaulted. He underwent trauma surgery for a left mandible fracture. AR 244.

A CT scan of Plaintiff's cervical spine performed on May 10, 2008, revealed degenerative changes but no cervical spine fracture or dislocation. AR 237.

A CT scan of Plaintiff's head performed on May 10, 2008, revealed a mass-like density in the left frontal region with prominent surrounding edema. AR 238. An MRI of his head performed the same day showed a large para falcine/anterior interhemispheric fissure mass. AR 242.

He was discharged on May 14, 2008, with diagnoses of status post assault, closed head injury, brain tumor and left mandible fracture. AR 244. Plaintiff was to be followed on an outpatient basis for his closed head injury and brain tumor. AR 244-245.

On June 4, 2008, Plaintiff saw Mark Levy, M.D., for discussion of his brain tumor. He denied dizziness, headaches or blurred vision and believed that he was in very good health. His

physical examination was normal and he denied depression or anxiety. Dr. Levy noted that the MRI showed an intracerebral mass, suspicious for meningioma. Plaintiff was to be scheduled for a craniotomy with tumor resection. AR 224-226.

On June 17, 2008, Plaintiff was seen for high blood sugar and surgery clearance. He was diagnosed with uncontrolled diabetes, hypertension and an asymptomatic mass on his lung. AR 222-223, 231.

Plaintiff was admitted to Community Regional Medical Center on August 11, 2008, after his mother witnessed a five minute seizure. During his hospitalization, he was treated with IV antibiotics and Dilantin, and did not exhibit any seizure activity. Treatment notes indicate that a craniotomy was scheduled in June but was cancelled for an unknown reason. Plaintiff reported smoking one pack of cigarettes per day since age 17. He also reported a history of cocaine abuse but denied IV drug use. An August 22, 2008, chest x-ray revealed a right basal mass of uncertain significance. AR 403. Plaintiff was discharged on August 24, 2008, with diagnoses of (1) left frontal lobe mass most likely meningioma; (2) left elbow cellulitis secondary to MSRA; (3) generalized tonic-clonic seizures secondary to left frontal lobe mass, stable on Dilantin; (4) candida balanitis; and (5) steroid induced hyperglycemia. He was discharged in stable condition. AR 330-331, 334-343.

A head MRI performed on August 12, 2008, revealed a medial left frontal lobe mass, most compatible with meningioma. AR 329.

On September 4, 2008, Plaintiff saw Richard Engeln, Ph.D., for a psychological evaluation. Plaintiff reported that he stopped working in June 1984, after he was laid off, though he also stated that he last worked two years ago. He revealed his brain tumor and explained that his sugars were too high to have surgery. Plaintiff also described an assault two years ago that resulted in a broken jaw and lost teeth. He believed that the assault caused a lot of problems, including difficulty walking on his right foot. Prior to the assault, he had no problems but now he has seizures. AR 271-272.

Plaintiff presented alert and oriented with no evidence of delusions, hallucinations or confusion. He emphasized his physical problems, had difficulty walking and moved with sighs,

5

moans and groans. Subjectively, Plaintiff interpreted his medical problems as globally disabling. Preoccupation with medical issues and feelings of disability detracted from his concentration and effort on tasks presented. The obtained scores were underestimates of his abilities and reflect attitudinal-emotional issues. Testing showed verbal intelligence high in the mild range of mental retardation and visual intelligence in the moderate range of mental retardation. Plaintiff's response to the M-FAST was negative for exaggeration, though his response to the Rey 15 Item Memory Test was positive for exaggeration. AR 272-273.

Dr. Engeln diagnosed major depression related to medical-physical issues, alcohol use interacting with medical condition of diabetes, and academic delay, severe by history. Plaintiff's ongoing alcohol abuse issues suggested the need for a limited conservator to assist in money management. Verbally, cognitively and socially, Plaintiff was capable of job adjustment, consonant with education and work history. In the past, Plaintiff was able to receive multidimensional instructions and deal with the normal social exchanges of job adjustment. At this time, social-emotional preoccupation is around his adjustment to medical issues. Any restrictions would be primarily medical-physical in nature. AR 274-275.

Plaintiff was seen on September 8, 2008, for treatment of cellulitis on his left arm and right foot. AR 318. A right ankle x-ray taken the same day was normal. AR 319. Treatment notes indicated that his glucose needed to be controlled and his infections needed to be cleared prior to scheduling surgery. AR 323.

On September 29, 2008, State Agency physician R. Tashjian, M.D., completed a Psychiatric Review Technique Form. Dr. Tashjian opined that there was insufficient evidence to determine Plaintiff's functional limitations due to the positive test finding for exaggeration and the fact that the results were an underestimation of his abilities. AR 281-291.

A chest CT scan performed on November 19, 2008, revealed a nodule in the right lower lobe. AR 301.

On November 19, 2008, Plaintiff underwent a left frontal craniotomy without complication. AR 378-379. Pathology confirmed that the mass was a meningioma. AR 380-381. A November 23, 2008, MRI showed a residual meningioma on the frontal lobe. AR 383.

Plaintiff was discharged on November 24, 2008, and was to be followed as an outpatient. The discharge notes indicated that other than the residual tumor and a nodule on his right lower lung lobe, he had no other symptoms. Plaintiff had a "significant amount of smoking history" and a follow-up with a pulmonologist was suggested. He was instructed to return to most activities and follow-up with neurosurgery and the pulmonology clinic. He was also instructed to undergo home speech and cognitive therapy. AR 386-387.

Plaintiff was seen in follow up on January 5, 2009, and was "doing great." His gait was unstable and physical therapy was recommended. AR 296.

On January 6, 2009, State Agency physician C. De la Rosa, M.D., opined that Plaintiff's impairments were not severe. Dr. De la Rose noted that there were no complications related to Plaintiff's craniotomy and that despite Plaintiff's inconsistency with his insulin treatment, he had no end organ disease. AR 292-293.

On January 19, 2009, Plaintiff was seen in the pulmonary clinic. Plaintiff was completely asymptomatic and denied any shortness of breath or chest pain. His walking is limited since his surgery. Plaintiff reported smoking one pack of cigarettes every three days for the past 40 years. He used to be an alcoholic and last used cocaine eight months ago. A CT guided biopsy was recommended. AR 436-437.

On February 2, 2009, Plaintiff was seen in neurosurgery. He complained of right side lower extremity weakness/incoordination and mild speech difficulties. On examination, he had no cognitive deficits and sensation was intact. Plaintiff had restricted range of motion in his right hip flexor. AR 422.

On February 11, 2009, Plaintiff saw Steven E. Hysell, M.D., for evaluation of his lung mass. He noted that Plaintiff did "exceptionally well" after his surgery and had returned to normal functioning status. Plaintiff reported that he last worked one year ago and has smoked about a half-pack a day for the past 30 years. On examination, Plaintiff had a slight level of fatigue and slight numbness in the right foot. He denied feeling depressed. He had no coughing, shortness of breath or chest pain. AR 434-435.

An MRI of Plaintiff's brain performed on March 26, 2009, showed left frontal postoperative changes compatible with meningioma resection. AR 377-378.

Plaintiff was seen in neurosurgery on March 30, 2009, with no new complaints. He was receiving physical therapy for right sided weakness/incoordination. Plaintiff reported that his speech was improving. On examination, Plaintiff had no cognitive deficits and his sensory examination was intact. Plaintiff had been referred to "CyberKnife" for the residual meningioma. AR 421.

On April 8, 2009, Plaintiff returned to Dr. Hysell in the CyberKnife Clinic. Subjectively, Plaintiff was doing "quite well" with no headaches. He had slight difficulty with walking secondary to a limp with his right leg. On neurologic examination, Plaintiff was awake, alert and oriented times three. Cranial nerves were intact and motor examination revealed no focal deficits. Deep tendon reflexes were symmetric and Plaintiff had normal sensation with no pronator drift. Dr. Hysell noted that it was unclear whether the abnormalities were areas of enhancement of tumor. He recommended that Plaintiff receive another MRI in six months and return to the clinic for discussion of whether "stereotactic radiosurgery" is needed. AR 433.

On April 23, 2009, Plaintiff was discharged from physical therapy. He completed only three appointments and cancelled multiple appointments. Plaintiff still had difficulties following directions with simple physical tasks and performing higher-level balance activities. He did not reschedule missed appointments and was therefore discharged. Treatment goals were not met and educational goals were partially met. Plaintiff demonstrated fair compliance with his treatment regime and home exercise program. AR 582.

On April 28, 2009, Plaintiff was discharged from speech therapy due to nonattendance. The discharge note indicates that Plaintiff was seen for one appointment on February 1, 2009, but failed to return for any of his scheduled therapy. Plaintiff demonstrated poor compliance with treatment regime and home program. AR 581.

A needle biopsy of Plaintiff's lung mass performed on July 1, 2009, revealed an infectious granuloma with no evidence of malignancy. AR 570, 577.

Plaintiff was seen in the pulmonary clinic on August 24, 2009. Timothy M. Evans, M.D., explained that the biopsy sample was "somewhat equivocal in terms of the granulomatous features" but that this was the most likely diagnosis. Given this uncertainty, Dr. Evans recommended that Plaintiff continue with radiographic follow up. AR 642.

Plaintiff's Dilantin level was below therapeutic range on September 23, 2009. AR 656.

A CT scan of Plaintiff's head dated September 23, 2009, showed post-operative changes in the left frontal lobe and bilateral small arachnoid cysts. There was no acute abnormality. AR 562.

Plaintiff returned for seizure follow up on October 9, 2009. Notes indicate that Plaintiff was not compliant with Dilantin. AR 633. Plaintiff reported a car accident on September 23, 2009, after having a seizure while driving. AR 633. Plaintiff began 400 milligrams of Dilantin but became progressively off balance and dizzy. Plaintiff was instructed to go to the emergency department but refused. He agreed to have blood work to check for Dilantin toxicity. AR 633-634. Test results showed that Plaintiff's Dilantin level was above therapeutic range on October 9, 2009. AR 632.

On October 14, 2009, Plaintiff was seen in follow-up for seizures and to have his Dilantin level checked. AR 522. He was also seen in the CyberKnife Clinic and reported having a headache since the car accident. His cranial nerves were intact and his sensory examination was normal. He had minimal nystagmus, with the rest of his motor examination at 5/5. The area of enhancement was stable on MRI and Dr. Hysell recommended an MRI in one year. AR 529, 540.

Plaintiff's Dilantin was not in therapeutic range on November 3, 2009. AR 627.

On December 20, 2009, Plaintiff went to the emergency room after his family reported a three to four minute seizure. He was given Dilantin and discharged in stable condition. AR 500-503. Blood tests from December 23, 2009, show that his Dilantin level was not in therapeutic range. AR 623.

A January 14, 2010, CT scan of Plaintiff's chest revealed no significant change in his lung nodule. AR 499.

On February 9, 2010, Plaintiff was seen in the emergency room after having a seizure. He was given Dilantin and orange juice and discharged in stable condition. AR 481-483.

On March 19, 2010, an unknown source from Sierra Adult Health Center completed a Fresno County form for General Relief. The source opined that Plaintiff's seizures, impaired gait and "some weakness" substantially reduced his ability to work, though Plaintiff could perform limited full-time work. He could not drive, climb ladders or use power equipment, could not perform repetitive bending or lifting and could not lift more than 20 pounds. Plaintiff could not perform repetitive hand movements and could stand/walk for less than 15 minutes per hour. These limitations were expected to be permanent. AR 659-660.

On May 29, 2010, Amir Emtiazjoo, M.D., completed a Questionnaire. He opined that because of his seizures, Plaintiff should avoid driving, heavy machinery and dangerous equipment. When asked if the combination of Plaintiff's impairments precluded more than sedentary work, Dr. Emtiazjoo stated, "Yes, as above," referring to the driving, heavy machinery and dangerous equipment restrictions. Plaintiff had no limitations in sitting, standing or walking and did not need to elevate his legs. Plaintiff had tonic-clonic seizures and had been compliant with medication. Plaintiff's seizures cause him to fall and lose consciousness. Plaintiff has had these limitations since November 2008. AR 661-662.

ALJ's Findings

The ALJ determined that Plaintiff had the severe impairments of diabetes mellitus, benign neoplasm and seizure disorder. AR 13. Despite these impairments, Plaintiff retained the residual functional capacity ("RFC") to lift and carry 100 pounds occasionally and 50 pounds frequently, stand and/or walk for six hours and sit for six hours. Plaintiff had to avoid exposure to dangerous machinery and unprotected heights and could not operate motor vehicles. AR 14. With this RFC, Plaintiff could not perform his past relevant work, but could perform a significant number of jobs in the national economy. AR 17.

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations,

1  the Court must determine whether the decision of the Commissioner is supported by substantial
2  evidence. 42 U.S.C. 405 (g). Substantial evidence means "more than a mere scintilla,"
3  Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a preponderance. Sorenson v.
4  Weinberger, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a
5  reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at
6  401. The record as a whole must be considered, weighing both the evidence that supports and
7  the evidence that detracts from the Commissioner's conclusion. Jones v. Heckler, 760 F.2d 993,
8  995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must
9  apply the proper legal standards. E.g., Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).
10 This Court must uphold the Commissioner's determination that the claimant is not disabled if the
11 Secretary applied the proper legal standards, and if the Commissioner's findings are supported by
12 substantial evidence. See Sanchez v. Sec'y of Health and Human Serv., 812 F.2d 509, 510 (9th
13 Cir. 1987).

## REVIEW

15     In order to qualify for benefits, a claimant must establish that he is unable to engage in
16 substantial gainful activity due to a medically determinable physical or mental impairment which
17 has lasted or can be expected to last for a continuous period of not less than 12 months. 42
18 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of
19 such severity that he is not only unable to do her previous work, but cannot, considering his age,
20 education, and work experience, engage in any other kind of substantial gainful work which
21 exists in the national economy. Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th Cir. 1989).
22 The burden is on the claimant to establish disability. Terry v. Sullivan, 903 F.2d 1273, 1275 (9th
23 Cir. 1990).
24     In an effort to achieve uniformity of decisions, the Commissioner has promulgated
25 regulations which contain, inter alia, a five-step sequential disability evaluation process. 20
26 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f). Applying this process in this case, the ALJ found
27 that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of his
28 disability; (2) has an impairment or a combination of impairments that is considered "severe"

1  (diabetes mellitus, benign neoplasm and seizure disorder) based on the requirements in the
2  Regulations (20 CFR §§ 416.920(b)); (3) does not have an impairment or combination of
3  impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P,
4  Regulations No. 4; (4) could not perform his past relevant work; but (5) could perform a
5  significant number of jobs in the national economy. AR 13-17.

6  Here, Plaintiff argues that the ALJ (1) failed to give sufficient reasons to reject the
7  treating physicians' opinions; (2) failed to properly discredit his testimony; and (3) failed to
8  properly reject the lay witness testimony.

**DISCUSSION**

A.  Analysis of Medical Opinions

Plaintiff first argues that the ALJ failed to properly reject the opinion of Dr. Emtiazjoo and the opinion of an unnamed source from Sierra Adult Health Center. Plaintiff characterizes both of these physicians as treating sources.

The opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant. *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir.1998); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995). Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record. *Lester*, 81 F.3d at 830. Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record. *Id.* (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983)). This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.1989). The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct. *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir.1988). Therefore, a treating physician's opinion must be given controlling weight if it is well-supported and not inconsistent with the other substantial evidence in the record. *Lingenfelter v. Astrue*, 504 F.3d 1028 (9th Cir. 2007).

Plaintiff faults the ALJ for failing to give any reasons for rejecting Dr. Emtiazjoo's May 29, 2010, opinion. Dr. Emtiazjoo opined that Plaintiff could not perform more than sedentary work and cited his need to avoid driving, heavy machinery and dangerous equipment. AR 661-662. The ALJ did not address this opinion, however, because it was submitted to the Appeals Council *after* the ALJ issued his opinion. AR 4.

In any event, even if Dr. Emtiazjoo is a treating source, his opinion does not establish disability, as Plaintiff contends. Plaintiff argues that Dr. Emtiazjoo opined that he was "disabled by tonic clonic seizures, frequent seizure attacks, despite compliance with medications." Opening Brief, at 6. The only limitations that Dr. Emtiazjoo noted were seizure-related precautions, and such limitations were included in the ALJ's RFC. Although Dr. Emtiazjoo answered "yes" to whether Plaintiff's impairments prevented him from performing more than sedentary work, he pointed only to the seizure-related precautions in support of this finding. Dr. Emtiazjoo specifically stated that Plaintiff did not have any limitations in his ability to sit, stand or walk. AR 661-662.

Next, Plaintiff argues that the ALJ failed to give legitimate reasons for rejecting the March 2010 opinion of an unknown source at Sierra Adult Health Center. The opinion was set forth on a Fresno County form to determine eligibility for General Relief. AR 659-660.

After setting forth the source's opinion, the ALJ explained that he afforded it little weight. AR 16. First, the ALJ noted that "this level of restriction" was not warranted based on the record as a whole. AR 16. Indeed, although this source stated that Plaintiff could not stand and/or walk for less than 15 minutes an hour, perform repetitive bending or hand movements, or lift more than 20 pounds, such limitations were not mirrored anywhere else in the opinion evidence. Nor were the limitations supported by the medical records. Despite Plaintiff's medical problems, he was often noted as doing well, with only minor complaints related to right-sided weakness and gait instability. His physical examinations were often unremarkable. Moreover, Plaintiff went to only three of his scheduled physical therapy appointments. AR 16. The ALJ also noted that the residual tumor was stable. AR 16.

The ALJ next explained that the identity of the source was unclear as the signature on the form was illegible. AR 16. Plaintiff contends that the ALJ should not have rejected the opinion on this basis and should have instead of recontacted the source for clarification. The Court agrees that in some circumstances, it would be improper for the ALJ to reject an opinion because parts of the opinion were illegible. *See eg.*, *Belmont v. Astrue*, 2009 WL 2591347, *16 (E.D. Cal. 2009). Here, however, the actual limitations were clearly set forth and even if the signature was legible and the source was a treating source, the limitations remained unsupported by the evidence.

Ultimately, the ALJ arrived at an RFC that falls between the State Agency physician's opinion that Plaintiff's physical impairments were not severe and the more limiting opinion of the physician at Sierra Adult Health Center. The ALJ is entitled to resolve conflicts in record evidence and for the reasons set forth above, his analysis is supported by substantial evidence and free of legal error. *Magallanes v. Bowen*, 881 F.2d 747, 751-55 (9th Cir.1989).

B.     Analysis of Plaintiff's Credibility

Next, Plaintiff argues that the ALJ failed to set forth sufficient reasons for rejecting his subjective testimony.

In *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), the Ninth Circuit summarized the pertinent standards for evaluating the sufficiency of an ALJ's reasoning in rejecting a claimant's subjective complaints:

> An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional impairment. *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989). However, to discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific, cogent reasons for the disbelief.'" *Morgan*, 169 F.3d at 599 (quoting *Lester*, 81 F.3d at 834). The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id*. Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." *Id*.
>
> Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony. . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, ... and are to be relied upon as precedents in adjudicating cases."); *see Daniels v. Apfel,* 154 F.3d 1129, 1131 (10th Cir.1998) (concluding that ALJ's decision at step three of the disability determination was contrary to agency regulations and rulings

and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Fair, 885 F.2d at 603*; *see also Thomas, 278 F.3d at 958-59*.

In his decision, the ALJ concluded that Plaintiff was not entirely credible. He first explained that Plaintiff gave conflicting accounts of when he stopped working. In September 2008, Plaintiff told Dr. Engeln that he stopped working in 1984, and as the ALJ notes, Plaintiff's earning records support this. AR 135, 271. He also told Dr. Engeln that he last worked two years ago. AR 271-272. In February 2009, Plaintiff told Dr. Hysell that he last worked one year ago, and during his February 2009 testimony, Plaintiff stated that he last worked two or three years ago. AR 30, 434-435. Certainly, the ALJ is entitled to consider Plaintiff's inconsistent statements. Plaintiff suggests that "whether or not [he] worked continuously prior to onset has no bearing on his ability to work after brain surgery leaving him with a seizure disorder." Opening Brief, at 8. The ALJ is not citing Plaintiff's statements in support of whether he can work, however. Rather, he cites the statements to illustrate Plaintiff's inconsistent statements, which cast doubt on his overall credibility. The ALJ may use "ordinary techniques" in addressing credibility. *Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997)*, and may make inferences "logically flowing from the evidence." *Macri v. Chater, 93 F.3d 540, 544 (9th Cir. 1996)*.

The ALJ next explained that Dr. Engeln was unable to obtain accurate scores of Plaintiff's mental abilities because of attitudinal-emotional issues. AR 15. Earlier in his decision, the ALJ noted that Plaintiff's response to the "Rey 15 memory test was positive for exaggeration, although other tests did not reveal exaggeration." AR 13. Though Plaintiff is correct that Dr. Engeln did not make an affirmative finding of malingering, the ALJ is nonetheless entitled to take various aspects of the examination into account when assessing credibility.

In reviewing Plaintiff's medical record, the ALJ also noted that he "was scheduled for physical therapy and speech therapy, but only went to 3 physical therapy appointments and the initial speech therapy session." AR 16. The ALJ also noted that Plaintiff's Dilantin levels were

frequently not in the therapeutic range. AR 16. Though Plaintiff contends that the ALJ should have sought an explanation for the sub-therapeutic levels, at least one doctor specifically stated that Plaintiff was not compliant with Dilantin. AR 633. A claimant's failure to follow prescribed treatment is a proper basis for questioning credibility. *Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001).

Based on these reasons, the Court finds that the ALJ's credibility analysis is supported by substantial evidence and free of legal error.

C.  Analysis of Lay Witness Testimony

Finally, Plaintiff argues that the ALJ improperly rejected the testimony of his friend, Delores Guillen, and his sister, Esperenza.

"In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work." *Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009) (citing *Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir.2006)). Such testimony is competent evidence and "cannot be disregarded without comment." *Id.* (citing *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir.1996)). If an ALJ disregards the testimony of a lay witness, the ALJ must provide reasons "that are germane to each witness." *Id.* Further, the reasons "germane to each witness" must be specific. *Stout*, 454 F.3d at 1054 (explaining that "the ALJ, not the district court, is required to provide specific reasons for rejecting lay testimony").

The ALJ, however, need not discuss all evidence presented. See *Vincent on Behalf of Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir.1984). Rather, he must explain why "significant probative evidence has been rejected." *Id*. (*citing Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir.1981)). Lay witness testimony which is neither significant nor probative may be properly ignored. *See id*. at 1395. Similarly, third party testimony which is unsupported or controverted by medical evidence may be rejected. See *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir.2005).

Ms. Guillen completed a Third Party Function report and indicated that she sees Plaintiff for three to five hours a day, three days a week. Plaintiff is unable to sleep and takes short naps. He takes short walks, but stays close to the house. Plaintiff is dizzy and has headaches, and is

not as active as he once was. He watches television and reads, though not too much because of headaches and blurry vision. He also cannot be around crowds too much because of the noise. Lifting more than 30 to 40 pounds causes head pressure. AR 154-160.

Similarly, Plaintiff's sister reported that he sleeps most of the day and watches television. He wakes up with severe headaches and seems "lost in thoughts." Plaintiff cannot bend to put his shoes on and cannot zip up his pants. He needs a chair to sit on because of balance issues and needs help getting around so that he doesn't fall. His illness affects almost all of his physical and mental abilities. AR 193-200.

The ALJ summarized this testimony and gave it "little weight" because the statements were not consistent with the record as a whole. AR 15-16. For example, Plaintiff's own testimony was inconsistent with the lay witness testimony and indicates that he was more active than the witnesses' descriptions. AR 15. As the ALJ noted, Plaintiff testified that he can clean his room, prepare simple meals, take showers, walk for 15 minutes to his cousin's house and go to church twice a month. AR 15.

The statements were also inconsistent with the medical evidence described throughout the ALJ's decision and this opinion. AR 15. Plaintiff suggests that Ms. Guillen and his sister set forth testimony that was consistent with Dr. Emtiazjoo's description of Plaintiff's seizures, but Dr. Emitiazjoo ultimately concluded that Plaintiff was not limited in sitting, standing or walking. Third party testimony which is unsupported or controverted by medical evidence may be rejected. See *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir.2005).

For these reasons, the Court finds that the ALJ's analysis of the lay witness statements was supported by substantial evidence and free of legal error.

## **RECOMMENDATION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence and is based on proper legal standards. Accordingly, the Court RECOMMENDS that Plaintiff's appeal from the administrative decision of the Commissioner of Social Security be DENIED and that JUDGMENT be entered for Defendant Michael J. Astrue and against Plaintiff Edward Guevara.

1  These Findings and Recommendations will be submitted to the Honorable Lawrence J. O'Neill pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within thirty (30) days after being served with these findings and recommendations, any party may file written objections with the court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **November 2, 2011**               /s/ Dennis L. Beck
                                         UNITED STATES MAGISTRATE JUDGE